564 F.2d 1119
 24 Cont.Cas.Fed. (CCH) 81,817
 FORT SUMTER TOURS, INC., Appellee,
v.
Cecil D. ANDRUS, Secretary, Department of the Interior,
United States, An Agency of the United States of America,
and
Gray Line Water Tours, Inc., Appellant.
 No. 77-8308.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 7, 1977.
Decided Nov. 3, 1977.
 
 Coming B. Gibbs, Jr., Charleston, S. C. (A. Hoyt Rowell, III, John M. Bleecker, Jr., Gibbs, Gaillard, Rowell & Tanenbaum, Charleston, S. C., on brief), for appellant Gray Line Water Tours.
 Robert B. Wallace and Morris D. Rosen, Charleston, S. C., for appellee.
 Larry G. Gutterridge, Dept. of Justice, Washington, D. C., for appellant Andrus.
 Before WINTER, Circuit Judge, FIELD, Senior Circuit Judge, and HALL, Circuit Judge.
 WINTER, Circuit Judge:
 
 
 1
 Gray Line Water Tours, Inc. (Gray Line) sought a stay pending appeal of the district court's preliminary injunction preventing the Secretary of the Interior and his designates from entering into any contract to provide boat transportation to and from Fort Sumter National Monument until further order of court. The litigation had been instituted by Fort Sumter Tours, Inc. (Fort Sumter) which sued the Secretary to prevent him from entering into a concession contract in derogation of Fort Sumter's statutory right of preference and to require the Secretary to enter into a contract with Fort Sumter. Gray Line had intervened, and it appeals. The Secretary did not appeal. By agreement of the parties, we decide the appeal and not merely the granting or withholding of a stay pending appeal, and we affirm.
 
 I.
 
 2
 Gray Line is engaged in conducting tours and excursions on the waters of Charleston Harbor. Prior to 1968, it provided boat transportation between Charleston and the Fort Sumter National Monument, an island in the Charleston Harbor under the jurisdiction of the National Park Service (Service), pursuant to a concession contract with Service. Since January 1, 1968, this boat-transportation concession has been held by Fort Sumter. The existing contract between Fort Sumter and Service is due to expire December 31, 1977. On or about July 23, 1976, Service determined to negotiate a new ten-year concession contract, commencing January 1, 1978.
 
 
 3
 The Secretary, through the National Park Service, is authorized by 16 U.S.C. § 20a to enter into concession contracts with private corporations for the provision and operation of facilities and services necessary to the administration of the National Park System, of which Fort Sumter National Monument is a part. At the heart of the present controversy is 16 U.S.C. § 20d, the text of which is set forth in the margin.[1] In essence, § 20d grants preferential renewal rights to those existing concessioners who have performed their obligations under prior contracts in a manner satisfactory to the Secretary. It is conceded by all parties to this litigation that Fort Sumter has performed its obligations during the last ten years to the satisfaction of the Secretary and is, therefore, entitled to preferential rights in the negotiation of the new contract. The dispute concerns the meaning and scope of this preferential right and whether, in the particular case, Service gave Fort Sumter the full measure of its statutory right.
 
 
 4
 The dispute arose in the following manner: On July 23, 1976, the Regional Director of Service was authorized to negotiate a new concession contract for the provision of boat transportation to and from Fort Sumter. Consistent with existing practice, the Regional Director and Fort Sumter negotiated a document referred to as the "Fact Sheet," at once both the bid specifications and Fort Sumter's preliminary working proposal. Pursuant to the requirements of § 20d, Service published notice on December 9, 1976, in the Federal Register, advising the public that Fort Sumter had performed the existing contract in a satisfactory manner, that it was Service's current intention to negotiate a new contract with Fort Sumter, but that it would consider and evaluate any other proposals from interested parties submitted within thirty days. In response to this notice, Gray Line submitted its proposal on January 4, 1977.
 
 
 5
 On March 1, 1977, the Regional Director informed both parties that Fort Sumter's proposal was clearly superior and that the new concession contract would be negotiated with Fort Sumter. Following informal protests by Gray Line, the Office of Audit and Investigation in the Interior Department reviewed the documentation supporting the Regional Director's decision and concluded, in a report dated May 19, 1977, that the decision to enter into negotiations with Fort Sumter should be rescinded and the process begun anew.[2]
 
 
 6
 On August 9, 1977, the Regional Director advised Fort Sumter of Service's intention to negotiate the new contract with Fort Sumter, conditioned, however, on Fort Sumter's agreeing to modify its proposal to meet certain items in the Gray Line proposal which Service considered clearly superior.[3] By letter dated August 12, the Regional Director further advised Fort Sumter that it had until the close of business on August 26 to make its decision. Fort Sumter was further advised that its failure to accept the additional terms would operate as an automatic waiver of Fort Sumter's preferential negotiating rights and would result in Service's entering into negotiations with Gray Line.
 
 
 7
 On August 24, 1977, two days before the deadline set by Service, Fort Sumter filed this suit against the Secretary, complaining that Service's conditional offer to negotiate and accompanying ultimatum constituted an arbitrary and capricious denial of Fort Sumter's statutory preferential negotiating rights. On the same day, Fort Sumter advised Service that it was accepting Service's conditional offer to negotiate and would meet the specified additional terms but would do so only if the instant litigation proved unsuccessful. By letter dated September 8, Service construed this conditional acceptance as a rejection and a waiver of preferential negotiating rights.II.
 
 
 8
 The district court exercised jurisdiction pursuant to 28 U.S.C. § 1331(a).[4] While conceding that this statute grants the federal court general equity jurisdiction in a case brought by an aggrieved person against a federal administrative agency, Gray Line contends that Service's decision to deny Fort Sumter its statutory preference and to negotiate exclusively with Gray Line is not "final agency action" within the meaning of the Administrative Procedure Act § 10(c), 5 U.S.C. § 704,[5] and, therefore, is not ripe for judicial review.
 
 
 9
 While it is generally true that judicial review awaits the issuance of a formal administrative order enforceable against a person or class of persons, such action is not an absolute prerequisite to judicial review. Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); Medical Committee for Human Rights v. Securities and Exchange Commission, 139 U.S.App.D.C. 226, 432 F.2d 659 (1970), vacated as moot, 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972). In Abbott Laboratories, the Supreme Court admonished lower federal courts to take a functional approach in resolving ripeness questions. The goals are: "to prevent the courts . . . from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." 387 U.S. at 148-49, 87 S.Ct. at 1515. To effect these goals, the Court suggested that lower courts consider chiefly two factors in analyzing a ripeness problem: first, "the fitness of the issues for judicial decision . . . ", and second, "the hardship to the parties of withholding court consideration." 387 U.S. at 149, 87 S.Ct. at 1515.
 
 
 10
 Applying the Abbott Laboratories criteria, we conclude that Service's decision to deny Fort Sumter its statutory preference and to negotiate instead with Gray Line is "final agency action" within the meaning of the Administrative Procedure Act § 10(c).
 
 
 11
 The issues before the district court are legal in nature ones traditionally within the competence of the judicial branch. That court must decide, as federal courts often must in reviewing administrative action, the precise scope of plaintiff's statutory entitlement and whether such entitlement was improperly denied by the Secretary. As the correspondence of August 9, 12 and September 8 makes clear, both Service's interpretation of the statutory preference and its legal relationship with the plaintiff have become fixed. No further administrative action as regards plaintiff is contemplated unless negotiations break down between Gray Line and Service. As between Fort Sumter and Service, the issues have become sufficiently crystallized to warrant judicial resolution. For all of these reasons, we find nothing to be gained by refraining from exercising jurisdiction at this time.
 
 
 12
 If, as urged upon us by Gray Line, judicial review is postponed until a concession contract is executed, the delay might prove costly to all concerned.[6] If a court were to invalidate a fully executed contract for the reason that, at the outset, a statutory preference was denied negotiation costs would have to be repeated and tourism in the Charleston area might be adversely affected by the disruption in boat transportation between Fort Sumter and the mainland. The better course is to resolve the dispute now by clarifying Fort Sumter's legal rights prior to the execution of the new contract.
 
 
 13
 We hold, therefore, that the district court acted properly in exercising its general federal equity jurisdiction under 28 U.S.C. § 1331(a).
 
 III.
 
 14
 We turn to the merits of the present appeal. The ultimate merits of the controversy are not before us on appeal and we do not decide them. We decide only whether the grant of interim injunctive relief to Fort Sumter was appropriate under the facts of this case.
 
 
 15
 In Blackwelder Furniture Co. v. Seilig Manufacturing Co., 550 F.2d 189, 196 (4 Cir. 1977), we recently held that "in this circuit the trial court standard for interlocutory injunctive relief is the balance-of-hardship test." This means that, in determining whether to grant or to withhold interim injunctive relief, the district court should consider (a) the applicant's probable right, (b) the likelihood of danger to that right if interim relief is denied (irreparable injury), (c) the harm to other interested parties of issuing an injunction, and (d) the public interest. In weighing these factors, a district court must recognize that there is a correlation between an applicant's probable right, i. e. the probability of his ultimate success in enforcing or protecting the right that he asserts, and the probability of irreparable injury to him. If the likelihood of success is great, the need for showing the probability of irreparable harm is less; but if the likelihood of success is remote, there must be a strong showing of the probability of irreparable injury to warrant the grant of interim relief. More significantly:
 
 
 16
 The two more important factors are those of probable irreparable injury to plaintiff without a decree and of likely harm to the defendant with a decree. If that balance is struck in favor of plaintiff, it is enough that grave or serious questions are presented; and plaintiff need not show a likelihood of success. Blackwelder, 550 F.2d at 196.[7]
 
 
 17
 Under the Blackwelder test of when a district court should grant interim injunctive relief, we have no doubt that the district court correctly granted a preliminary injunction. As the district court found, the balance of hardships clearly favors Fort Sumter. While at worst Gray Line, which conducts other water tours around the Charleston Harbor, may be required to forego expanding its business for several months pending the outcome of this suit, Fort Sumter, whose only operation is carrying passengers to and from Fort Sumter Island, will be forced to a complete cessation of its operation on December 31, 1977 if the negotiations between Gray Line and the Secretary continue their present course. If required to discontinue operations, Fort Sumter might find it impossible to resume operations even if its legal rights are eventually vindicated. We note also that Fort Sumter has agreed, even if the existing contract expires during this period, to continue to provide tourist transportation until this litigation has ended and a new contract has been executed, so that it cannot be said that the grant of interim injunctive relief will harm the public interest.
 
 
 18
 We repeat that we do not decide the ultimate issues that this litigation presents, but we have no doubt that it raises serious questions as to whether Fort Sumter's statutory preference was observed. It seems elementary that for preferential negotiating rights to be real rather than illusory, the proposal of an outside bidder should be both responsive to bid specifications and sufficiently final that the existing concessioner is fairly apprised of what he is called upon to equal. We see a question of whether Gray Line's bid may be judged responsive when it contained neither an offer to contribute to the furnishing of the new terminal to be constructed by Service, nor the designation of a specific docksite within the City of Charleston from which to operate.[8]
 
 
 19
 Even if Gray Line's bid is responsive, we see a substantial question as to whether Service afforded Fort Sumter its statutory preference when Fort Sumter was simply advised of those items from Gray Line's proposal which Service deemed to be superior, but denied the opportunity to see the bid and to acquaint itself with possible deficiencies in order to protest what it considered an unqualified bid. Additionally, the district court must consider whether, after nondisclosure, Service's direction to Fort Sumter either to meet the competing proposal or to lose its preferential negotiating rights ran afoul of the statute.
 
 
 20
 Since the district court both followed and correctly applied Blackwelder, it follows that its order granting a preliminary injunction is
 
 
 21
 AFFIRMED.
 
 
 
 [1]
 Renewal preference for satisfactory performance; extensions; new contracts; public notice
 The Secretary shall encourage continuity of operation and facilities and services by giving preference in the renewal of contracts or permits and in the negotiation of new contracts or permits to the concessioners who have performed their obligations under prior contracts or permits to the satisfaction of the Secretary. To this end, the Secretary, at any time in his discretion, may extend or renew a contract or permit, or may grant a new contract or permit to the same concessioner upon the termination or surrender before expiration of a prior contract or permit. Before doing so, . . . the Secretary shall give reasonable public notice of his intention so to do and shall consider and evaluate all proposals received as a result thereof.
 
 
 [2]
 The Audit Office found particularly objectionable the practice of negotiating the Fact Sheet with the existing concessioner. The Report recommended that a new Fact Sheet be produced free of any influence by either bidder. In addition, the Report recommended that notice be republished in the Federal Register and that proposals be resubmitted. There is, however, no evidence in the record that the Director followed these recommendations. It appears that he did no more than reconsider the documents he already had before him
 
 
 [3]
 There were three items in the Gray Line proposal which the Director felt were clearly superior: (1) the proposed rates to be charged the public were lower; (2) the proposed franchise fee to be paid the government was more generous; and (3) the liquidated damages which Gray Line agreed to pay in the event of being unable to perform its obligations were higher. There were also certain defects in the Gray Line proposal which are evident from the record: namely, a failure to specify a docksite on the mainland from which to operate and a failure to agree to contribute a certain sum toward the furnishing of a new terminal to be constructed by Service. One of Fort Sumter's principal contentions is that these defects rendered the Gray Line proposal unresponsive to the specifications and that, therefore, it was improper for Service to require Fort Sumter to meet "superior" terms in Gray Line's proposal
 
 
 [4]
 As the district court noted in its order granting interlocutory relief, the Supreme Court has recently announced that the Administrative Procedure Act, 5 U.S.C. § 701 et seq., is not an independent source of subject matter jurisdiction to review agency action. Califano v. Sanders, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). Fort Sumter's complaint alleging jurisdiction under 5 U.S.C. §§ 701-706 is, therefore, defective. However, under the newly amended § 1331(a), which eliminates the jurisdictional-amount requirement in suits against the United States or its agents, jurisdiction was vested in the district court. Jurisdiction which otherwise obtains is not defeated by invoking the wrong statute in the complaint. Blue v. Craig, 505 F.2d 830, 844 (4 Cir. 1974)
 
 
 [5]
 Actions reviewable
 Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.
 
 
 [6]
 A concession contract involving a gross annual business of $100,000 or more or exceeding five years in duration, including renewals, must be submitted to the Interior Committees of both Houses of Congress for a sixty-day period prior to the effective date. 16 U.S.C. § 1a-7(c) (1976). Gray Line takes the extreme position that judicial review is not proper until this sixty-day period of Congressional review has passed. We find even less merit in this contention than in the less extreme view discussed in the body of the opinion
 
 
 [7]
 Blackwelder also holds that the test is different when a reviewing court is asked to stay a decision of a district court or an administrative agency pending review on the merits. The principal difference is the need of the applicant to make a strong showing that he is likely to prevail on the merits. The instant case is not one where the district court is empowered to review the correctness of the agency's action on the record made before the agency. It is one in which the district court performs the primary and original adjudicatory function. For this reason, we need not comment further on the appellate standard discussed in Blackwelder. See 550 F.2d at 194
 
 
 [8]
 With regard to the latter, the specifications may also be deemed to be inadequate, with the result that the bidding process should begin anew, since they require bidders to have a docksite within the City of Charleston, but there are numerous potential sites within the City of Charleston which would be inconvenient to customary tourist traffic. Moreover, the designation of the docksite in the customary tourist area may have economic consequences such as increased costs which would affect an outsider's bid with regard to rates and quality of service